CARR, J.
This cause was argued with a research and an ability worthy of its importance and its novelty; for to us it is new, though to our forefathers, both the legal doctrines and the form of action, were of common and familiar use. I shall not attempt to discuss the whole subject; but shall consider those leading points only, which seems to me, to govern the case.
Prudence, it is admitted, was tenant in tail. The demandants claim as her issue per formam doni. It is obvious then, to examine how that claim stands affected by the statutes which our legislature has passed on the subject. It may not be amiss, however, to premise a few remarks as to estates tail.
At the common law, when lands were given to a man and the heirs of his body, he was considered as having a fee simple conditional, which would revert to the donor, if the donee had no heirs of his body; but if he had, this was such a performance of the condition, is, rendered his estate absolute ; at least, he could alien; he might forfeit; he might charge the land with rents, or other incumbrances, which would bind the issüe. But if he did none of these things, the course of descent was regulated by the form of the gift; the land would go to the heirs of his body, and in default of such, would revert to the donor. To prevent this, it was usual for such tenants, so soon as they had performed the condition by having issue, to alien the land, and afterwards re-purchase, taking an absolute estate which would descend to their heirs general. To put a stop to this practice, the nobles and great barons, anxious to perpetuate their possessions in their own families, procured the passage of *the statute of Westminster 2nd, 13 Ed. 1, ch. 1, de donis conditionalibus; which gave birth to estates tail. That familj' law, as Pigot calls it, produced many and serious mischiefs, as we are told by writers on the subject, and also by some of the most eminent judges of the english bench. Thus Blackstone (2 Comm. 216,) says, “children grew disobedient, when they could not be set aside: farmers were ousted of their leases, made by tenant in tail: creditors were defrauded of their debts: innumerable latent entails were produced, to deprive purchasers of the lands they had fairly bought: treasons were encouraged: so that these estates were justly branded, as the source of new contentions, and mischiefs unknown to the common law, and almost universally considered, as the common grievance of the realm.” Still the power of the nobles prevented the repeal of the statute; and after suffering under it long, common recoveries first, and then fines, were brought to bear upon it; and these, together with some other causes, have so weakened, its force, and narrowed its range, as almost to bring back the subject to the ground it occupied under conditional fees at the common law. In the case of Martin v. Strachan, Willes’ Rep. 451, 2, lord C. J. Willes (in 1744) delivering the opinion of all the judges to the lords, and speaking of common recoveries, says, “a common recovery is a conveyance on record, invented to give tenant in tail an absolute power to dispose of his estate in fee simple —I beg your lordships’ patience a moment longer, to give you an account of the true origin and nature of these recoveries. As I said before, entailed estates, by the statute de donis, were made unalienable, and neither the issue, nor the remaindermen could be barred, and this was at first considered as a very wise provision, and great encomiums were made upon this statute. But it was found by experience in a very little time, that this statute had produced very great inconveniences; inconveniences to the crown; inconveniences to the public; and to manj' private persons: to the crown, as it prevented forfeitures, and greatly increased the power of the *barons: to-the public, as it was prejudicial to trade and commerce, to have estates always continue in the same families, without even a power of raising money upon them; and to private persons, to have their estates so fettered, that they could not make provision for younger children, nor raise money on their estates, though their necessities were never so great. ’ ’ He then goes to speak of the mode of bringing in recoveries in the time of Edward IV. In Atkyns v. Horde, 1 Burr. 60, 115, lord Mansfield, speaking on the same subject, says, “The sense of wise men, and the general bent of the people of this country, have ever been against making land perpetually unalienable. The utility of the end, was thought to justify any means to attain it. Nothing could be more agreeable to the law of tenures, than a male fee unalienable. But this bent, to set property free, allowed the donee, after a son was born, to destroy the limitation, and break the condition of his investiture. No sooner had the statute de donis repeated, what the law of tenures said before, that the tenor of the grant should be observed, than the same bent permitted tenant in tail of the freehold and inheritance, to make an alienation voidable only, under the name of a discontinuance. But this was a small relief. At last, the people having groaned for about 200 years, under the inconveniences of so much property being unalienable; and the great men, to raise the pride of their families, and (in those turbulent times) to prevent their estates from forfeitures, preventing any alteration by the legislature: the same bent threw out a fiction in Taltarum’s case, by which tenant in tail of the freehold and inheritance, or with consent of the freeholder, might alien absolutely. Public utility, adopted and gave a sanction to the doctrine, for the real political reason, to break entails; but the ostensible reason, from the fictitious recompense, hampered succeeding times, how to distinguish cases, which were within the false reason given, but not within the real policy of the in *311 vention.” I cite these authorities (and might adduce "many more) to shew, that at an early period, the mischiefs of the statute had been *felt, and remedies found to mitigate them, which had become settled rules of law, long before the establishment of this colony ; so much so, that the right to suffer a recovery or levy a fine, was considered one of the inseparable incidents of an estate tail; and an attempt to create such estate, divested of that power, would have been as impotent, as the effort to divest tenant in fee of the power of alienation. «
In Carter v. Tyler, 1 Call, 182, Mr. Pendleton says, the fine and recovery at an early period was sanctioned by the courts of England, “and so became as much a law of that country, as the statute itself. Our ancestors [he continues] brought hither with them, both laws as a rule of property; and the fine and recovery might have been used here, if the forms could be preserved, until the legislature should interpose to prohibit them.” This it did by an act passed in October 1705, and again in 1710, reserving to the legislature the sole power of docking entails. This power was exercised by acts passed on each particular occasion : these acts gave a real recompense, instead of the fictitious one by fine and recovery; and were rather a change of the land on which the estate tail was to operate, than a destruction of that estate. There are several other acts of the colonial assembly shewing the spirit of that body for preserving entails; of these, Mr. Pendleton, in the case of Carter v. Tyler, gives a succinct but clear account. It may seem a little strange, at first sight, that our assembly should be inclined to cherish what had been found so mischievous in the mother country: but we must recollect, that we were then a recent people, forming a distant province of the empire; that the spirit of commerce had never visited our shores; nor was that loftier spirit yet awakened which afterwards gave birth to our revolution. In the case already referred to, Mr. Pendleton says, “In .the revised law of 1748 the prohibition of fines and recoveries, and permission of writs of ad quod damnum, were continued till the revolution. That event having produced a new order of things, this great subject came before the legislature, in October 1776, *under a view of all its legal circumstances, from the common law and the statute de donis, down to that period. The subject of discussion ■was, whether they should restore the fine and recovery, which was objected to on account of its fictitious nature, and the trouble and expense attending it; but the principal objection was, that it would permit the tenants to continue what was considered as a mischief; and that those who possessed the large estates, would have an inclination to continue them in their families. They, therefore, resolved to cut the gordian knot at once, and ipso facto to vest the fee simple in those who then had, or should in future have, an immediate beneficial interest; that is to say, an estate in fee tail in possession, or a remainder or reversion in tail, after estates for life or lesser estates, unfettering the estates of all future interests, depending in creation, upon these estates tail.” Let it be recollected, that Mr. P. is speaking here of matters with which he was familiarly acquainted ; that he was a prominent actor in the busy and eventful scenes of the revolution ; a member of the assembly which passed the- act of 1776 docking entails, and also one of the three revisors who drew the law of 1785 on the same subject.
We will look now more particularly at this act of 1776. It seems to my mind very difficult to read it, and resist the conviction, that it was meant to cut up estates tail, root and branch; to make them all ipso fa cto estates in fee; to destroy ‘1 all rights, title, interest and estate, claim and demand of the issue, remainderman and reversioner;” “unfettering the estates (as Mr. Pendleton strongly expresses it) of all future interests depending in creation upon those estates tail.” And this conviction is much strengthened, when we look at the nature of the subject, and the state of things at the passage of the law. We had just cut ourselves loose from a monarchy, and established a republican form of government. This was the first assembly which met under the new constitution, and it became its duty, to remodel the laws, and adapt them to the genius of our infant republic. In this ^labour, it was natural that the law of entails should attract the earliest attention; a law, mischievous in its effects upon the general interests of society, and peculiarly hostile to the experiment we were then making.*
*312 *Look at the preamble, and note the object and policy of the statute, as there declared: Can we suppose, that wise and patriotic legislators would intentionally leave a single fragment existing, of a law, the evils of which they so strongly depict? In Willion v. Berkley, Plowd. 232, 11 Rep. 73, 6 Bac. Abr. 384, we are told, that “such construction ought to be put upon a statute, as may best answer the intention which the makers had in view, for qui hasret in litera, haaret in cortice.” Again, under the same head in Bacon, and vouched by the highest authorities, it is said, “The intention of the makers of a statute, is sometimes to be collected from the cause or necessity of making a statute; at other times, from other circumstances. Whenever this can be discovered, it ought to be followed with reason and discretion in the construction of the staiute, although such construction1 seem contrary to the letter of the statute.” Again, in Stowel v. Zouch, Plowd. 366, 10 Rep. 101, “A thing which is within the intention of the makers of a statute, is as much within the statute, as if it were within the letter.” Now, the statute in question makes tenant in tail, in possession, reversion or remainder, ipso facto, tenant in fee simple. In the act of 1785, which equally bears on this case, which was the work of the same hands, and which one of its makers says was not more extensive than the first law, the idea is thus expressed: “Every estate in lands or slaves, which'on 7th October 1776, was an estate in fee tail, shall be deemed from that time to have been, and from thenceforward to continue an estate in fee simple.” Much of the learning and ability of the argument were employed to prove, that Prudence, by her conveyance with warranty, had divested herself of the estate tail; that it was not vested in Vande-ver, because from the nature of the estate it could not *be, and because also the deed to him purported to
convey the fee; that it could not be in the issue, because they could have no right, whatever during the life of their mother, for nemo est haares viventis; but that, in truth and in law, the conveyance and warranty of Prudence operated a discontinuance, and put the estate tail in abeyance: and the conclusion from the whole was, that neither Prudence nor Vandever, nor the issue, having an estate tail in possession, reversion or remainder, the case was not reached by the statutes of 1776 and 1785, and must be considered as if they had never passed. I have examined this whole doctrine with my best care; and though I feel the highest respect for the counsel who so ably and zealously laboured these points, I must say, that taking all the premises as established, it is clear to my mind, that the conclusion does not follow. I concede, therefore, that the conveyance of Prudence at once worked a discontinuance, and put the estate tail in abeyance; that is, there was no person who could claim title, but the estate still existed, “in the intelligence, remembrance and expectation of the law.” If the laws destroying entails did not reach it, it must be either because an estate in abeyance cannot be barred, or because, the legislature did not mean to bar it, or because, meaning to do it, they have not used words, which will effect their meaning. As to the first; in Chudleigh’s case, 1 Rep. 135, b, 135, a, Gawdy, justice, said, “That in divers cases, a thing in abeyance may be barred and destroyed; as if tenant in tail be disseised, and releases to the disseisor; now, Littleton says, the estate tail is in abeyance; yet it may be barred by common recovery, in which tenant in tail is vouched.” In Mildmay’s case, 6 Rep. 42, a, it is said, “So, Hil. 14 Eliz. it was resolved by all the justices of the common pleas in Copwood’s case, that if there be tenant in tail, the remainder to the right heirs of J. S. and tenant in tail suffers a common recovery, J. S. being then alive, it shall bar the remainder which was in abeyance and consideration of law.” 2 Roll’s Rep. 217, 221, and Palm. 139. Thus it is clear, that in England, an ^estate tail, though in abeyance, might be barred and destroyed by a common recovery ; a fictitious proceeding founded on no statute law, but growing out of public convenience, and the decisions of the courts; a proceeding to which the issue, the remainderman, or the reversioner, were no parties, and which gave them no recompense. Can it then be doubted, that such estates may with us be destroyed by a solemn law enacted by the sovereign, authority? Assuredly not.
But, if the legislature had this power, did it intend by its laws to exercise it? With respect to estates tail in possession, reversion or remainder, it is admitted that it did. These were the prominent points, the great interest; and these are cut up by the roots; but it is contended, that here the law stopt, and that the possibility of a future interest in the issue, on which the demand-ants, in the case before us, stand, was either not seen, or, if seen, permitted to remain undisturbed. On the same ground, in Carter v. Tyler, it was insisted, that a contingent remainder was not within the operation of these acts. What was the answer of the court? The president says, “And what is the general aspect of Mr. Washington’s reasoning? The issue, who have the first and most important interest, are defeated; and a contingent remainder, which may nevér take effect, and which I call an estate in the clouds, is preserved. I believe it may be truly said, that no statute ever proceeded upon such a system.” But passing by the absurdity, which such a construction would fix on the wise lawgivers and profound statesmen, who laid *313 the foundations of our government, it seems to me, that these laws themselves furnish the strongest evidence that was intended to destroy every possible interest of the issue. In the preamble, one of the mischiefs stated as the “injury to the morals of youth, by rendering them independent of, and disobedient to, their par-entsthis has direct reference to the issue. Another part of the preamble states, that “the former method of docking estates tail by special laws, employed very much of the time of the legislature, and was burthen-some to the public, and to individuals:” this shews, *that the intention was, to perform by one general law, the office of those special acts. And what was that office? to turn the estate tail into a fee simple, and bar the issue, remainder-man, and reversioner; and in many of these special acts, we find that the estate tail was already in abeyance, the tenants having executed and recorded deeds of conveyance with warranty to the purchasers, which are recited in the preamble of the act. It is true, these acts gave the issue ■&c. a recompense: but that was a mere creature of the legislative will; they had just the same power to bar them without such recompense. Again, if we look into those special acts (of which I have examined some thirty or forty) we shall find in every one of them, a saving of the rights, interests, title &c. of all persons, other than those claiming under the will, or deed creating the estate tail. So, in this act of 1776, we find a saving to all persons &c. other than the issue, and those in reversion, and remainder, all such right, title, interest, and estate, claim and demand, as they might claim if this act had never been made. Now, I ask, why except the issue from this saving, if it had not been intended to bar their right, title, interest, claim and demand? words, which cover every possibility of interest. It is clear to me, then, that the intention of the law was utterly to destroy the interests of the issue.
But can we give this intention effect? I have already shewn from authority, lhat intention is the governing principle, the essence of the law. “Every estate [says the statute] which, on 7th October 1776, was an estate tail, shall be deemed from that time to have been, and from thenceforward to continue, an estate in fee simple. ’ ’ Now, I ask, was not the estate, in the case before us, an estate tail on 7th October 1776? You tell me it was in abeyance: admitted, but that did not extinguish it, nor change its nature; it still existed in contemplation of law, and was still an estate tail though in abeyance. Littleton, Coke, all the books, speak of estates tail in abeyance. In the extract from Chudleigh’s case before cited, it is said “if tenant in tail be disseised, ^Littleton saith, the estate tail is in abeyance.” This estate tail then was within the operation of the act; which destroyed it, extinguished the right of the issue, and thereby enured to the benefit of Vandever, the vendee of Prudence. Is this effect too much to claim for a law, which has been appropriately called a great general common recovery, when we see by the cases cited, that a special and individual common recovery will destroy an estate tail though in abeyance? and when we know, that these recoveries are mere inventions to convert estates tail into fees, which was the direct object of our laws?
But, suppose it were admitted, that an estate tail in abeyance, is not within the express letter of our laws; is it not within the equity? We are told, “By an equitable construction, a case not within the letter of a statute, is sometimes holder: to be within the meaning, because it is within the mischief for which a remedy is provided. The reason of such construction is, that the lawmaker could not set down every case in express terms.” Co. Litt. 24, b, 6 Bac. Abr. 386. Now, all will agree, that the great mischief which our law meant to remedy, was the fettering, the tying-up of property. We do not know, whether the cases were many or few, but every case like the one before us, would thwart the policy of the law, and continue the fetters on the land, at least one generation longer, when it was meant to cut them all loose at once. Look at the effects in the case before us. The law passed in 1776; the tenant died in 1816; and it is contended, that during all this time the land was tied up; nay, that it is so to this hour, for the demandants, if they recover, must recover an estate tail.
There are several other points, which were urged with great force against the claims of the demandants, as 1. that the repeal of the statute do donis in 1792, during the life of the tenant in tail, when the issue had no vested interest, swept from under them the foundation of their claim : 2. that they claim as issue in tail, and yet all the heirs of the body are joined; 3. that they claim under our statute of descents, and *yet claim an estate unknown to and unprovided for by that statute. On these points I give no opinion, choosing to place the case solelj’ upon the abolition of the right by the statutes.
I think the judgment should be reversed, and judgment entered for the tenant.
CABELL, J.
The question is, Whether the entail of the lands in controversy was docked by the statute of 1776, so as to bar the issue of Prudence Harbour?
If the entail be not thus docked, it must be owing to the effect of her deed to Van-dever, upon the estate tail which she held in the land before the execution of that deed; for, were it not for that deed, the case would come within the strictest letter of the statute, and the issue would, unquestionably, be barred. I shall endeavour, therefore, to ascertain the effect of the deed, before I inquire into that of the statute. And this will, necessarily, lead me into a brief view of the origin of estates tail.
Estates tail grew out of the operation of the act of Westminster the second upon fees conditional at the common law ; which were estates given to a man and the heirs of his body, and so called, because of the condition expressed or implied in the gift, that the land should revert to the donor, if the donee had no heirs of his body, but if he had, *314 that it should then remain to the donee. And, as in other cases, when a condition is once performed, the condition is thenceforth intirely gone, and the thing to which it was before annexed becomes absolute and unconditional, so in this case, as soon as the grantee had any issue born, his estate was supposed to become absolute by the performance of the condition; so far, at least, that he might alien it, and thereby bar not only his own issue, but the reversioner. 2 Black. Comm. 110, 111. And the birth of the issue was not held to be a condition which suspended the fee from vesting, immediately, by the gift; for if he aliened before the birth of issue, it was not only no forfeiture, but, if he afterwards had issue, it was a bar to them. Plow. 239; 2 Inst. 333; Harg. Co. Hitt. *326, b, note 1. The statute de donis was made for the purpose of taking away this power of alienation. It declared that the will of the donor should be observed, and that tenements given to a man and the heirs of his body, should, at all events, go to the issue, if there were any; or if none, should revert to the donor. 2 Black. Comm. 112. Blackstone remarks, that “upon the construction of this act of parliament, the judges determined that the donee had no longer a conditional fee simple, which became absolute and at his own disposal, the instant anj issue was born; but they divided the estate into two parts, leaving in the donee a new kind of particular estate, which they denominated a fee tail; and investing in the donor, the ultimate fee simple of the land, expectant on the failure of issue; which expectant estate is what we now call a reversion. And hence it is that Littleton tells us, that tenant in fee tail is by virtue of the statute of Westminster the second.”
This statute, however, was eluded by the effect which the courts, in the reign of Edward IV. gave to the fictitious proceedings in common recoveries, which, when’suffered by tenants in tail, were held to be an effectual destruction of estates tail. “And these recoveries, however clandestinely reduced, are now,” says Blackstone, (Ibid, 117,) “become a most common assurance of lands; and are looked upon as the legal means by which tenant in tail may dispose of his lands and tenements.” And the effect of such conveyance is to bar, not only the issue, but the remaindermen and re-versioner. And, in the reign of Henry VIII. it was enacted, that a fine, duly levied by tenant in tail, should bar the issue and all claiming under such entail. But there are other conveyances by tenants in tail, which do not bar the issue; and it is important to our present purposes, that their precise effect should be ascertained.
Conveyances by grant, by bargain and sale, lease and release, covenant to stand seized, and by release and confirmation in enlargement of an estate, only operate on the right of the party conveying. They, therefore, transfer only the *right, that is, the estate which the party has a right to convey. Hence they are called rightful conveyances, (Harg. Co. Litt. note 1, § I,) and sometimes innocent conveyances, because, in the language
of Littleton, (£ 600,) “they do no hurt or damage to other persons who have right therein.” It was formerly doubted, whether the alienation of tenant in tail, by any of these conveyances, passed any thing more than an estate during his life. But it is now definitively settled, by the authorities cited in the argument for the appellees, that such alienation by tenant in tail, passes to the- grantee, bargainee &c. an estate of inheritance, a base fee simple, which is unimpeachable during the life of tenant in tail, and which will moreover last as long as the estate tail shall continue, unless it shall be avoided by those who have right to avoid the same; and that until it shall be so avoided, such estate has all the incidents of a fee simple. See also Thomas’s Co. Litt. p. 92, note A. and p. 124, note G. 1. The estate of the grantee, although it be unimpeachable during the life of the tenant in tail, and may last as long as the estate tail shall continue, may, nevertheless, be avoided at any time after the death of tenant in tail, by the mere entry of the issue; and it determines absolutely and ipso facto, by the failure of the issue in tail, under the rule, cessante statu primitivo, cessat derivativas. 1 Prest. on estates 436, 7, 2 Id. 462, 3. But a conveyance by feoffment is attended with livery of seizin. It therefore operated on the possession, and effected a transmutation thereof; and as possession and freehold were synonymous terms, no person being considered to have the possession of lands but he who had himself, or held for another, at least an estate of freehold in them, a convej'ance which transferred the possession, must necessarily be considered a,s transferring an estate of freehold, or, to speak more accurately, the whole fee. A feoffment, therefore, conveying the whole fee, and not merely the right or estate which a party had a right to convey, was called a tortious conveyance. Harg. Co. Litt. 271, b. note 1, § I. But tenant in tail had an estate of inheritance ^(although a particular estate) even after the statute de donis. “Ifence, [says Butler], if he made a feoffment, it did not, during his life, effect or prejudice the issue. Thus his alienation was, primarily, a lawful transfer; the alienee came in by right, and his estate could not be impeached during the life of the donee. In conformity to the established rule of the common law, that wherever any person acquired a presumptive right of possession, his possession was not to be-defeated by entry, however slender or unlawful the title of the grantor himself might be. the statute de donis did not nullify the alienations of the donee in tail, but enabled the issue to defeat them by the. formedon in the descender.” Harg. Co. Litt. 326, b. note 1. The estate transferred by the feoffment of the tenant in tail, is therefore, something more than that which was transferred by his mere bargain and sale, lease and release &c. It is not a base fee that may be defeated, at any time after the death of the tenant in tail, by the mere entry of the issue, and must necessarily determine on the failure of issue; but it is a fee simple defeasible *315 only by the action of the issue, or of those in remainder or reversion. For the estate of the tenant in tail, and of those in remainder and reversion, is turned, by the feoffment, into a right of action. And this effect of the fe-offment of tenant in tail, upon the estate tail, turning it into a right of action, so that it cannot be regained by mere entry, is what is called a discontinuance; and while the discontinuance remains in force, the new estate, the fee simple which passed to the feoffee, will subsist until avoided by the action of the issue &c. or until the remitter of the issue in tail &c. or the determination of the discontinuance. (Preston on estates, ubi supra). Fines and recoveries, when they operate as mere assurances, without barring the entail, effect a discontinuance. And although the bargain and sale, or lease and. release of tenant in tail, without warranty, does not affect the interest of the issue &c. and cannot, therefore, work a discontinuance, yet a warranty annexed to such a conveyance, will, in the general, work a discontinuance as “effectually as a feoffment. Co. Litt. 328, a, 329, b, 330, a, note 1, and Doe v. Prestwidge, 4 Mau. & Selw. 178. The expression of Coke (Co. Litt. 329. a,) “it is not a warranty only that maketh a discontinuance, but the warranty and the descent upon him that right hath together,” induced me to think, at one time, that the discontinuance did not take place until the actual descent of the warranty, and, of course, until the death of tenant in tail. But farther examination and reflection have caused me to change that opinion, and I am now inclined to believe, that the warranty operates an immediate discontinuance in all cases, where, if the tenant in tail were to die at the moment of making the conveyance, the obligation of the warranty, and the right to the estate tail, would devolve upon the same person. I think so, because, in all such cases, the warranty operates as wrongfully in relation to the issue, as the mere feoffment of tenant in tail, and, indeed, more so: for while the feoffment only drives the issue to his action, the warranty goes farther, and will rebut him, if he have assets by descent. This opinion seems to derive strength from the consideration, that all the cases put by Littleton, to shew that warranty alone will not effect a discontinuance, are cases where, at the time of the conveyance, the heir to the warranty, and the heir to the estate tail, were not the same persons. In the case now before us, at the time of the execution of the deed from Prudence Harbour (she then having issue) the same person would, unquestionably, have been heir to the warranty, and to the estate tail. I am, therefore, of opinion, that that deed operated a discontinuance, immediately; or, in other words, turned it to a right; or, to speak more accurately, to a right of action.
Thus far, it will be seen that, I agree intirely to the preliminary propositions of the counsel for the appellees.
How far the right to the estate tail, is. after a discontinuance, and during the life of tenant in tail, placed in abeyance, I feel myself unable to decide. The books are very contradictory on this point. Littleton 'i 649, 650, and Coke’s “commentary on them, seem to me to indicate, that it is in abeyance. But there are strong opinions to the contrary. In Sheffeild v. Ratcliffe, Hob. 335, it is said, that ‘ ‘the feoffment of tenant in tail, gives away all the estates the tenant in tail feoffor had, as concerning himself, or anjr benefit that he may receive. But, as concerning his issue inheritable to the entail, and for their good, there remains in him a right of that entail, by force of the statute of Westm. 2, for the good of those that are saved by that statute against his alienation.” Again (Ibid. 336,) “a tenant in tail hath the whole estate tail and all the right of it in himself, and may finally and totally bar it, as well against the issue, as against himself, by a common recovery, notwithstanding this statute; but by a feoffment he could not, by reason of this statute. And, therefore, that chief and mere right [which though it be discontinued is not barred by the feoffment] remains where it was not aliened; for it is not in his power by that kind of conveyance.” Again (Ibid. 338,) ‘ ‘that there is still a right in the tenant in tail against this feoffment, appears in that he hath still power to bind it more finally and totally, by his fine or recovery, if he pursue them rightly.” And (Ibid. 339,) “Littleton was confounded in himself that made an abeyance of a tenant of totum statum suum, and yet made it but an estate for life.” And in the case of Stone v. Newman, in the exchequer chamber, Cro. Car. 427, six of the judges of England said, that “although a feoffment by tenant in fee simple gives all estates, interests and rights, yet it is not so in case of a feoffment made by tenant in tail; because the estate tail is an incident inseparable to his person and blood, and cannot be transferred to any other.”
But whether the right to the estate tail, after a discontinuance, and during the life of tenant in tail, be in abeyance, or lie dormant in the tenant in tail, it is absolutely certain, that the tenant in tail, after such discontinuance, has the right and the power, with the assistance and co-operation of his alienee, to suffer a common recovery, which will enure to “'corroborate and confirm the estate of his alienee, and will bar the issue &c. Sheffeild v. Ratcliffe, Hob. 334; Lincoln College case, 3 Rep. 58, b; Chudleigh’s case, 1 Rep. 135, 6; per Gawdy justice; 1 Prest. Con. 138.
Thus stands the law in England, and thus stood the law in this country, before the act of 1776; except that fines and recoveries were prohibited as early as 1705, and were never afterwards tolerated. But, although estates tail were not permitted to be barred by fines and recoveries, other modes were introduced for accomplishing that effect; namely, writs of ad quod damnum where the estate was of less value than £200. sterling; and private acts of assembly, in each particular case, where the estate was of greater value. An examination of our statute book will shew, *316 that these private acts were applied to •docking estates tail, in every variety of circumstance or situation, in which a common recovery could be resorted to in England, for that purpose. Sometimes the entail was docked in favour of the tenant in tail himself, by vesting the entailed lands in him in fee simple; Nov. 1769, ch. 73, 8 Hen. stat. at large, 448. Sometimes it .was docked in favour of a person to whom the tenant in tail had previously contracted to sell it; February 1772, ch. 77, 78, Id. 641, 643. The act of Nov. 1769, ch. 77, Id. 455, presents a very striking case, bearing a strong resemblance to the case before us. It is as follows: Richard Johnson, being .seized of lands in tail, with divers remainders over, conveyed the same by indenture bearing date June 7, 1744, to John Robinson, who, with others claiming under him, remained in possession until November 1769. It being then discovered that Johnson had only an estate tail in the lands, and that the purchasers were likely to be disturbed in their title, and the said Johnson and his family involved in law suits on that account (from which it is manifest that he sold with warranty) an application was made to the legislature, in the year 1769, (twenty-five years after the sale, and while the discontinuance worked by the warranty was still in force); whereupon an act was passed docking *the estate tail, and vesting the entailed lands in the purchasers under Johnson.
I come now to the construction of the statute of October 1776, docking entails. Its title is “an act declaring tenants of lands or slaves in taille, to hold the same in fee simple;” and its preamble shews, that it was enacted in lieu of the former methods of docking such estates tail. The counsel for the appellees contend, that this statute does not embrace the case of an estate tail that was discontinued, so long as the discontinuance remains in force. They say that the words of the statute “hath, or hereafter may have an estate tail in any lands or slaves in possession,” and the subsequent words, “shall from henceforth, or from the commencement of such estate taille, stand ipso facto seized,” &c. require that the tenant in tail, in whose favour the statute is to operate, should, at the time, be seized of an estate tail in possession &c. If I felt myself bound to give the statute a strict and technical construction, I confess I could not deny the correctness of this position. But what would be the consequence of such a construction? If it be adopted, it will not only exclude the case of a tenant in tail who had discontinued the entail, and the case of an estate tail abated by the entry of a stranger, on the death of tenant in tail, but it would also exclude the case of a tenant in tail who was disseized. For, a tenant in tail disseized is certainly not seized of the estate tail. Strictly and technically speaking, even his estate is turned to a right: a right of entry. 1 Prest, est. 20, 21; Goodright v. Forester, 1 Taunt. 578. And if the statute did not operate on the estate of tenant in tail, who had discontinued or who was disseized, so as to turn it into a fee simple at the very moment of the enactment, when did it operate on it so as to produce that effect? It was contended in the argument, that the estate tail must be restored by the entry of the tenant in tail, in case of disseizin, 'or by the formedon of the issue or remainderman, in the case of a discontinuance, and that when it was thus restored as a fee tail, the statute would instanter act upon it and convert it ‘'-into a fee simple. I can perceive nothing in the statute to justify this pretension. It alludes to two periods only for its operation; namely, the time of the passage of the act, and the commencement of the estate tail. But according to the construction contended for, it did not operate, at the time of its passage, upon an estate tail that was, at that time, turned into a right of entry or a right of action. And if it did not operate on it at that time, it cannot operate on it at the time the fee tail is restored by entry or action; for that is not the commencement of the estate tail. It had commenced long before, and was never annihilated. The most that can be contended for is, that it was suspended or in abeyance, by the discontinuance. The removal of the discontinuance is the restoration, or reanimation of the estate tail, not its commencement. It, certainly, is not the “commencement” of the estate tail, according to a strict construction of the statute; and the advocates of a strict construction, have no right to insist upon it as to one clause, and upon a liberal construction as to another. Here then, would be two classes of estates tail, those restored by entry, and those restored by action, on which the statute would never operate; to which we might add those cases where the estate tail was under a mortgage at the date of the act. Can any man read the preamble of this statute, and believe that this was the intention of the legislature? It is a law founded on great principles of national policy. It is a highly remedial statute, intended to remove great political and moral mischief. So far from being restricted to a rigid technical construction, according to the letter, I feel myself compelled to construe it according to its spirit, and thus to bring within the scope of its operation all cases that come within the mischief intended to be provided against. The division of estates, into estates in possession, remainder and reversion, comprehends every estate whatever ; so far at least as relates to the time at which they confer the right of enjoyment. 1 Prest, est. 23. When, therefore, the legislature declared that all persons having any of these descriptions of estates tail, should *from thenceforth be seized thereof in fee simpre, it thought not of technicality; it thought not of the particular situation in which persons having rights to estates tail, might be accidentally placed, in relation to those estates : it was contemplating, in all their extent, the various mischiefs which it was its object to remove; it intended, that all estates tail should be thenceforth converted into fee simple.
Mr. Pendleton, than whom no man was better acquainted with the history of our legislation, informs us, in Carter v. Tyler, *317 that “the great subject of discussion, in the legislature in the year 1776, was, whether they should restore the fine and recovery, which was objected to on account of its fictitious nature, and the trouble and expense attending it; but the principal objection was, that it would permit the tenants to continue what was considered as a mischief; and that those who possessed the large estates, would have an inclination to continue them in their families. ’ ’ It cannot be supposed, that the legislature was ignorant of the nature of common recoveries, and of the power of the donee in tail who had discontinued the estate tail, to suffer a common recovery with the assistance and co-operation of the person who had the freehold; and that such recovery would operate to corroborate and confirm the estate of his alienee, and to bar the issue in tail, and the reversioner and remain-derman. It cannot be believed, that it had forgotten its own practice of docking estates tail, by private acts, in favour of the persons to whom the tenants in tail had sold with warranty; and that the effect of such docking was to vest the fee simple in the alienee. When, therefore, we perceive, in the preamble of the statute ot 1776, the deep conviction of the legislature of the evils of estates tail, and its strong determination to annihilate them, even in opposition to the wishes of those interested in them, can wc believe, that the new mode of docking estates tail, which they adopted in preference to all former modes, was intended to be less extensive in its application, and less efficacious in its operation, than the former modes were? To my mind it is impossible. *1 cannot doubt but that this statute was intended to operate as one great universal recovery, and to dock all estates tail whatever; those created before the enactment, instanter and ipso facto; those to be thereafter created, from the moment of their commencement. And such was the construction given to the first statute of 1776, by the legislature, in the revised statutes of 1785 and 1792. Por, in these, they drop all the expressions of the act of 1776, which gave rise to any doubt on the subject, and adopt the broadest term known to our language: “Every estate in lands or slaves which on the 7th October 1776, was an estate tail, shall be deemed from that time to have been, and from thenceforward to continue an estate in fee simple.”
But, it is said, there are consequences resulting from this construction, which the legislature could not have intended; and it is thence inferred, that the construction is unsound. The premises must be established, before we can be required to assent to the conclusion. Those, who urge this argument, suppose the following case, namely, that tenant in tail had discontinued, and then died before the statute of 1776; or that he had been disseized and then died after the right of entry was tolled, but before the passing of the statute; or that a tenant in tail had died, and that a stranger had abated, before the enactment: and they then assert, that, if these rights to estates tail were converted by the statute of 1776, into rights to estates in fee simple, neither the issue in tail nor the remainderman entitled to them, could recover them by formedon in the descender or remainder; and that they could not recover them by writ of right, because they could not count upon their own seizin, or that of their ancestors, in their demesne as of fee.
I cannot subscribe to the correctness of the position as to the writ of formedon. Coke says, “the writ of formedon, a forma donationis, is so called because the writ doth comprehend the form of the gift.” It has no reference to the nature of the estate which it seeks to recover; for, it is applied as well to the recovery of estates in fee simple, as of ^'estates in fee tail. Pormedon in the reverter lay at common law for the donor, after the failure of the issue of tenant in fee conditional at the common law; and after the statute de donis, it lay for the reversioner, after the failure of issue in tail. Plowd. 235, a. Booth, 154, 3 Tho. Co. Pitt. p. 118, note D, and page 214, note N. And both at common law, and since the statute de donis, the estates recovered by the formedon in the reverter, were estates in fee simple. Porme-dons in remainder were unknown to the common law, but were given an equitable construction of the statute de donis ; and they are given as well to a remainderman in fee, as to a remainderman in tail. Pitz-herbert says, “the writ of formedon in the remainder lieth where a man giveth lands to one in tail, the remainder unto another in tail, and afterwards the first tenant in tail dieth without issue of his body, and a stranger doth abate and deforce him in the remainder; he in the remainder or his heirs shall have that writ of formedon in remainder. And so, if the first tenant in tail alieneth in fee, and dieth without issue of his body begotten, he in the remainder in fee, shall have a writ of formedon in remainder, to recover his estate &c. ” F. N. B. 217. As to formedons in descender, it is true that since the statute de donis, they have not been used in England, except for the recovery of estates tail; the reason of which is very obvious, namely, that none but the issue in tail can claim by descent per formam doni, and they always take an estate tail: yet there was one instance, at common law, in which even the formedon in the descender lay for the recovery of a fee simple. “As, if a man had issue a son, and his wife died, and afterwards he took another wife, and land was given to him and his second wife, and the heirs of their two bodies begotten, and they had another son, and the wife died, and afterwards the father died, and a stranger abated; there, before the statute, the son could not have a mort d’ancestor; for one part of the writ is to inquire if the demandant be next heir-to his father, and that, he is not, but the eldest son is the next heir; for which reason, such '*writ would not serve upon his title, and therefore, before the statute he should have a formedon in descender, which was no other than a writ founded on his case.” Plowd. 239, b.
Thus we see, that every species of writs of formedon has been used for the recovery of fee simple estates. There is no incompatibility, therefore, in resorting to them *318 now, for the recovery of estates in fee simple, (made such by the statute of 1776), in all those cases where they would have been the appropriate remedy, had the estates remained estates tail. The enlargement of the estates into fee simple, makes no difference. In the language of the case in Plowden, the formedon is still “no other than a writ founded on his case. ” And so the legislature must have understood it; for it has, since the statute of 1776, continued to prescribe* the limitation of all the writs of fqrmedon; thus shewing its opinion, that they are actions which may still be brought. It has enlarged the estate, but left the remedy unchanged. If the parties in the supposed cases, could recover by writs of formedon (as, I think, is evident) it is unnecessary to inquire, whether, if they could not thus recover, they might recover by writ of right founded on the statute.
If this view of the subject be correct, the argument drawn from the supposed consequences of our construction, falls to the ground.
Upon the whole, I am of opinion, that the statute of 1776, docked the entail of the land in controversy, and that, as the saving clause saves the rights of all persons other than the issue in tail and those in remainder and reversion, such docking of the entail enured to corroborate and confirm the fee simple which passed by the deed of Prudence Harbour; and that the judgment of the circuit court should be reversed with costs, and judgment entered for the appellant.
BROOKE, P., concurred.

Judgb Garb, read t'ne following extract from the memoir of Mr. Jefferson (Vol. L, p. 30, of the work lately published). It Is. without doubt, a lust account of the policy which induced the act of 1776, and of its history; and, in that view, is applicable to the question under consideration: but, besides, it is thought very fitting, that the striking; character Mr. J. has drawn of the late president Pen-dleton of this court, should be preserved among the reports of its decisions.
“On 12th October 1776,1 obtained leave to bring in a bill, declaring tenants in tail to hold their lanas in fee simple. In the earlier times of the colony, when lands were to be obtained for little or nothing, some provident individuals obtained large grants; and desirous of founding great families for themselves, settled them on their descendants in fee tail. The transmission of this property, from generation to generation, in the same name, raised up a distinct set of families, who being privileged by law In the perpetuation of their wealth, were thus formed into a patrician order, distinguished by the splendour and luxury of their establishments. From this order too. the king habitually selected his councillors of state; the hope of which distinction devoted the whole corps to the interests and will of the crown. To annul this privilege, and instead of an aristocracy of wealth, or more harm and danger than benefit to society, to make an opening for the aristocracy of virtue and talent, which nature has wisely provided for the interests of society, and scattered with equal hand through all its conditions, was deemed essential to a well ordered republic. To effect it, no violence was necessary, no deprivation of natural right, but rather an enlargement of it by a repeal of the law. For this would authorise the present holder to divide the property among his children equally as his affections were divided; and would place them, by natural generation, on the level of their fellow citizens. But this repeal was strongly opposed by Mr. Pendleton, who was zealously attached to antientestablishments; and who, taken all in all, was the ablest man in debate, I have ever met with. He had not, indeed, the poetical fancy of Mr. Henry, his sublime imagination, his lofty and overwhelming diction: but he was cool, smooth and persuasive; his language flowing, chaste and embellished; his conceptions quick, acute and full of resource; *312 never vanquished: for if he lost the main battle, he returned upon you, and regained so much of it, as to make it a drawn one, by dexterous manoeu-vres, skirmishes in detail, and the recovery of small advantages, which, little singly, were important all together. You never knew when you were clear of him, but were harassed by his perseverance, until the patience was worn down, of all who had less of it than himself. Add to this, that he was one of the most virtuous and benevolent of men. the kindest friend, the most amiable and pleasant of companions, which ensured a favourable reception to whatever came from him. Finding that the general principle of entails could not be maintained, he took his stand on an amendment, which he proposed, instead of an absolute abolition, to permit the tenant in tail to convey in fee simple, if he chose it: and he was within a few votes of saving so much of the old law. But the bill passed finally for in tire abolition." — Note in Original Edition.